IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No: 3:12-CR-317-L |
| v. | § | No: 3:12-CR-413-L |
| | § | No: 3:13-CR-030-L |
| BARRETT LANCASTER BROWN | § | |

### MEMORANDUM IN SUPPORT OF DEFENDANT'S OPPOSITION TO GOVERNMENT'S REQUEST FOR A GAG ORDER

BARRETT LANCASTER BROWN, through his counsel, respectfully submits this

memorandum to set the framework for oral argument on September 4, 2013, and to enter exhibits

that Mr. Brown believes are relevant to the courts determination.[1]

### STATEMENT OF FACTS

**A.  Barrett Brown**

Barrett Lancaster Brown is a thirty-two year old American satirist, author and journalist.

His work has appeared in Vanity Fair, the Guardian, Huffington Post, True/Slant, the Skeptical

Inquirer and many other outlets.  *See* Summary Chart of Select Publications by Barrett Brown,

Exh. A.  He is the co-author of a satirical book on creationism entitled *Flock of Dodos: Behind*

*Modern Creationism, Intelligent Design and the Easter Bunny*.  As described by Alan

Dershowitz, Felix Frankfurter Professor of Law at Harvard Law School, "Flock of Dodos is in

the great tradition of debunkers with a sense of humor, from Thomas Paine to Mark Twain." *See*

*Flock of Dodos* (book cover), Exh. B.  Indeed, Mr. Brown's use of sarcasm, humor and

---

[1] Mr. Brown enters these exhibits, mainly consisting of articles and commentary, for limited purpose of assisting the Court's determination in this matter, and not for the truth of the matter asserted by the statements therein.

hyperbole, used often to describe serious subject matter, has caused his admirers (and critics) to compare him to journalism icons such as Hunter S. Thompson. *See, e.g.*, Peter Ludlow, *The Strange Case of Barrett Brown,* THE NATION, June 18, 2012, Exh. C.

At the time of his arrest, Mr. Brown had finished a manuscript for a book on the failures of American punditry, and was working on a book about *Anonymous*, described by the government as "a loosely associated hacktivist group."[2] *See* Summary Chart of Select Publications about Barrett Brown, Exh. D (Item #19). Mr. Brown's knowledge about *Anonymous* also generated a great deal of media attention, *see generally*, Exh. D, including an award winning cover story in Dallas-based "D Magazine." *See* Tim Rogers, *Barrett Brown is Anonymous*, D MAGAZINE, March 23, 2011, Exh. E.[3]

Mr. Brown is also the founder of Project PM, a collaborative web publication whose contributors conduct research using publically available materials. *See* Barrett Brown, *Project PM*, TRUE/SLANT, March 24, 2010, Exh. F ("The major goals are (a) to reduce the negative influence of incompetent yet nonetheless well-regarded pundits such as Thomas Friedman and Charles Krauthammer and (b) to increase the positive influence of the more capable segments of the blogosphere.") Project PM's reports came to focus on the private military and intelligence contracting industry. In addition to his book project on *Anonymous*, these issues had become the focus of Mr. Brown's work at the time of his arrest. *See, e.g.*, Exh. A (Items 22–23, 27–28, 30–31, 53–55, 53–55, 57–58, 60–66).

Mr. Brown's reporting and knowledge about *Anonymous*, in addition to the military and intelligence contracting industry, led to a number of media appearances on MSNBC, Fox News

---

[2] The government uses the "Wikipedia" definition of *Anonymous* in their applications for search warrants.

[3] Mr. Rogers won an American Society of Magazine Editors "National Magazine Award" in 2012 for his profile piece on Mr. Brown.

and other news networks.  Prior to his arrest, he had also appeared as an interviewee in three

recent documentary films: *We Are Legion* (2012), *Future Radicals* (2012), and *Terms and*

*Conditions May Apply* (2013).

**B.  Media Coverage of Mr. Brown's Case**

In September of 2012, Mr. Brown was arrested.  *See* DOJ Press Release, Exh. G

("Federal Grand Jury Charges Dallas Resident With Making An Internet Threat And Other

Felony Offenses").  His arrest and subsequent indictment (12-CR-317) received a great deal of

additional attention from the media.  *See, e.g.*, Exh. D (Items 34–51).  The December 2012 and

January 2013 Indictments (12-CR-413 & 13-CR-030) brought further attention.  *See, e.g.*, Exh.

D (Items 54–71, 89–95).  Members of the media wrote numerous articles about Mr. Brown,

many of which expressed concern, and confusion over the nature of the charges.  For example,

Adrian Chen, a known as a critic of Mr. Brown, wrote:

> As a journalist who covers hackers and has "transferred and posted" many links to
> data stolen by hackers—in order to *put them in stories about the hacks*—this
> indictment is frightening because it seems to criminalize linking. Does this mean
> if a hacker posts a list of stolen passwords and usernames to Pastebin, the popular
> document-sharing site, and I link to them in a story or tweet I could be charged
> with "trafficking in stolen authentication features," as Brown has been? (I
> wouldn't typically do this, but I've seen plenty of other bloggers and journalists
> who have.) Links to the credit card number list were widely shared on Twitter in
> the wake of the Stratfor hack—are all the people who tweeted links going to be
> rounded up and arrested, too?

Adrian Chen, Former Anonymous Spokesman Barrett Brown Indicted For Sharing a Link

to Stolen Credit Card Data, GAWKER, Dec. 7, 2012.  Other journalists expressed alarm that Mr.

Brown's indictments were the result of prosecutorial abuse.  For example, Glenn Greenwald of

the Guardian wrote:

> The pending federal prosecution of 31-year-old Barrett Brown poses all new
> troubling risks. That's because Brown - who has been imprisoned since September
> on a 17- count indictment that could result in many years in prison - is a serious

> journalist who has spent the last several years doggedly investigating the shadowy
> and highly secretive underworld of private intelligence and defense contractors,
> who work hand-in-hand with the agencies of the Surveillance and National
> Security State in all sorts of ways that remain completely unknown to the public.
> It is virtually impossible to conclude that the obscenely excessive prosecution he
> now faces is unrelated to that journalism and his related activism.

Glenn Greenwald, The Persecution of Barrett Brown – and How to Fight It,

GAURDIAN, March 21, 2013.

Media interest and commentary related to Mr. Brown's case, and specifically the nature

of the charges against Mr. Brown has not receded.  Nor has it been limited to mainstream media

outlets.  Organizations such as *Reporters Without Borders* and the *Committee to Protect*

*Journalists* have issued statements and commentary related to Mr. Brown's case.  *See* Exh. D

(Items 119, 123, 135).

In addition, ongoing revelations of the NSA's mass data collection and surveillance

programs by Edward Snowden have brought further media attention to Mr. Brown's

investigative journalism.  Journalists have made numerous connections between Mr. Brown's

research on military and intelligence contractors, and what is now being revealed as a result of

Mr. Snowden's leaks.  For example, Charles P. Pierce noted in *Esquire*:

> Brown [..] managed to reveal a staggering network of connections between the
> government and various private enterprises, all of which were using the privatized
> security apparatus that has developed in this country over the past two decades.

Charles P. Pierce, A Marriage of Convenience, ESQUIRE, June 20, 2013.  *See also* Exh.

D (Items 113–121).

Finally—and perhaps paradoxically—the government's request for a gag order in this

case has brought additional attention to Mr. Brown's case.  *See, e.g.,* Exh. D (Items 127–135).

For example, Geoffrey King, Internet Advocacy Coordinator for the Committee to Protect

Journalists, writes:

> Tomorrow, a federal judge will weigh a prosecutor's motion for a gag order in connection with the U.S. government's prosecution of journalist Barrett Brown. The motion represents a troubling turn in an already-troubling case for press freedom--a case that could criminalize the routine journalistic practice of linking to documents publicly available on the Internet, which would seem to be protected by the First Amendment to the U.S. Constitution under current doctrine.

*See* Exh. D, (Item 135);

### C.  Statements by the Government

The government has issued two press releases in this case.  The government's first press release is an announcement of the 12-CR-317 Indictment.  *See* Exh. G.  The government's second press release, issued on December 7, 2012, related to the 12-CR-413 Indictment and is titled "Dallas Man Associated With Anonymous Hacking Group Faces Additional Federal Charges."  *See* DOJ Press Release, Dec 7, 2012, Exh. H.  Notably, the Indictment does not allege hacking, nor does it allege association between Mr. Brown and Anonymous.  See *Id.*

### D.  Statements by Mr. Brown and the Defense.

While dozens of articles have been published about Mr. Brown's case since counsel's appearance on May 1, 2013, counsel for Mr. Brown has collectively given quotes in a handful of articles. Mr. Swift has given quotes to the Dallas Morning News. *See* Robert Wilonsky, Former JAG lawyer who took on Guantánamo Bay (and won) to become part of hacktivist Barrett Brown' s legal team, DALLAS MORNING NEWS, April 30, 2013, Exh. I; Month before hacktivist Barrett Brown's trial date in downtown Dallas, attorneys wrestle over delay, gag order, DALLAS MORNING NEWS, Aug. 9, 2013, Exh. J. In addition, Mr. Ghappour has given quotes to the UK Guardian, *see* Exh. K, and Rolling Stone.  *See* Alex Zaitchik, Barrett Brown Faces Faces 105 Years in Jail (But No One Can Figure Out What Law He Broke), ROLLING STONE, Aug. 29, 2013, Exh. L.

Mr. Brown has published an opinion-editorial, a book review, and has given one quote, through his attorney, since counsel's entry into the case on May 1, 2013.  In July, the Guardian published an article by Mr. Brown about the private intelligence industry and it's champions, entitled "The cyber-intelligence complex and its useful idiots."  *See* Barrett Brown, The Cyber-Intelligence Complex and its Useful Idiots, GUARDIAN, July 1, 2013, Exh. M.  More recently, VICE has published a book review by Mr. Brown entitled "Reading 'Born Again' in Jail."  *See* Barrett Brown, Reading Born Again in Jail, VICE, Aug. 12, 2013, Exh. N. In addition, Mr. Brown has given a number of quotes to Rolling Stone through his attorney. *See* Exh. L.

## ARGUMENT

### A.  Applicable Law

Trial courts have "an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity." *U.S. v. Brown*, 218 F.3d 415, 423 (5th Cir. 2000); *Gannett Co. v. DePasquale,* 99 S.Ct. 2898, 2904 (1979). This is because prejudicial pretrial publicity may taint the jury venire or affect the actual outcome of the trial. *Brown*, 218 F.3d at 423; *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991). Execution of the trial court's duty must comport with First Amendment freedoms, which must instead be "applied in light of the special characteristics of the [relevant] environment." *Id.* at 424 (citing *Tinker v. Des Moines Indep. Community Sch. Dist.,* 89 S.Ct. 733, 736 (1969)).  Although litigants do not "surrender their First Amendment rights at the courthouse door," *id.* at 424, citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), courts may limit First Amendment freedoms where necessary to ensure a fair trial. *Id*. at 424.

In *Brown*, the Fifth Circuit held that a district court may impose a gag order on trial participants only if it finds that (1) extrajudicial commentary by those individuals "would present a substantial likelihood of prejudicing the court's ability to conduct a fair trial," *and* (2) the order is narrowly tailored and the least restrictive means available. *Brown,* 218 F.3d at 427-28. Applying this standard to the facts here shows that a gag order is unwarranted, as elaborated below. The *Brown* Court adopted this standard to both lawyers and parties only where "the court's overriding interest is in preserving a fair trial and the potential prejudice caused by extrajudicial commentary does not significantly depend on the status of the speaker as a lawyer or party." *Id.*

Restrictions of statements *unrelated* to a party's trial is a prior restraint—a predetermined judicial prohibition restraining specified expression—that faces a well-established presumption against it's constitutionality. *See Id.* at 425 (citations omitted).  In general, a prior restraint (usually directed at the press) will be upheld only if the government can establish that "the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest." *Id.*  The government must also establish that the order has been narrowly drawn and is the least restrictive means available. *See id.* (citations omitted).

## B. Application

### 1.  Mr. Brown's Statements Do Not Warrant a Gag Order

Since May of 2013, Mr. Brown has made three statements to the media, two of which where journalistic articles that did not concern his trial in any way whatsoever, and one of which did not remotely have the effect of tainting the jury venire.

> *a.  Mr. Brown has a Core First Amendment Right to Write Journalistic Articles that are Unrelated to His Case.*

7

As stated *supra*, Mr. Brown wrote an op-ed that was published by the Guardian on July 1, 2013 by the Guardian.  *See* Exh. M. The op-ed concerned what Mr. Brown terms the "cyber-industrial complex," and begins:

> It's a fine thing to see mainstream American media outlets finally sparing some of their attention toward the cyber-industrial complex – that unprecedented conglomeration of state, military and corporate interests that together exercise growing power over the flow of information. It would be even more heartening if so many of the nation's most influential voices, from senator to pundits, were not clearly intent on killing off even this belated scrutiny into the invisible empire that so thoroughly scrutinizes us – at our own expense and to unknown ends.
>
> Summing up the position of those who worry less over secret government powers than they do over the whistleblowers who reveal such things, we have New York Times columnist Thomas Friedman, who argues that we can trust small cadres of unaccountable spies with broad powers over our communications. We must all wish Friedman luck with this prediction. Other proclamations of his – including that Vladimir Putin would bring transparency and liberal democracy to Russia, and that the Chinese regime would not seek to limit its citizens' free access to the internet – have not aged especially well.
>
> *Id.* at 1.

The op-ed goes on for several pages, but contains no statements whatsoever about this trial, the charges underlying the indictment, the alleged acts underlying the three indictments against Mr. Brown, or even facts arguably related to this prosecution.

Mr. Brown also wrote a book review on Chuck Colson's *Born Again*.  See Exh. N. It was published by VICE on Aug. 12, 2013.  The book review contained no statements about this trial, the charges underlying the indictment, or the alleged acts underlying the three indictments against Mr. Brown.

Neither publication concerns the trial, and therefore does not fall under the government's proposed gag order.  In addition, neither publication "poses either a clear and present danger or a serious and imminent threat to a protected competing interest."  Nor do they create a substantial likelihood of prejudice to a fair trial, because they do not relate to his case.

   b.   *There Is No Substantial Likelihood of Prejudice to a Fair Trial From Mr.*
        *Brown's Public Statements Since May 1, 2013*

As stated *supra*, Mr. Brown gave quotes for an article in Rolling Stone magazine.  Those

quotes were:

> I'm not worried, or panicked.  It's not clear to me that I've committed a crime, or
> even what crime they're charging me with;
>
> For a long time, the one thing I was happy *not* to see in here was a computer.  It
> appears as though the Internet has gotten me into some trouble;
>
> In any case, this is all much bigger than me. As I say here. This is the kind of
> world that's coming if we continue to avert our eyes. And it promises to get much
> worse; and
>
> Prison is great for reading and for thought, until they start in with their
> Pentecostal nonsense.  It ruins everything.

*See* Exh. L at 2, 4, 6.

Although these quotes concerned this case, they did not provide any factual information,

comment on any specific evidence whether testimonial or documentary, or make any arguments

about the legal merits.

**2.   Statements Made By Mr. Brown's Attorneys Do Not Warrant a Gag Order.**

As stated *supra*, Messrs. Ghappour and Swift's statements are contained in Exhibits I–L.

Although these quotes concerned this case, they did not provide any factual information,

comment on any specific evidence whether testimonial or documentary, or make any arguments

about the legal merits.  As such, no substantial likelihood of prejudice to a fair trial exists as a

result of these statements.

**3.   There are Other Less Restrictive Means Available than the Government's
        Requested Gag Order.**

Despite the arguments above, if the court nevertheless has strong concerns that the pretrial publicity could prejudice either the outcome of the trial or the jury venire, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991), there are less restrictive means available to address those concerns. Among the less restrictive means to imposing prior restraints on speech, for the purposes of eliminating or reducing the impact of prejudicial pretrial publicity, are: "searching" voir dire, "emphatic" jury instructions, jury sequestration, and even change of venue. *Brown*, 218 F.3d at 430-31; *Gentile*, 501 U.S. at 1075.

Here, the government has not made any showing as to why any of these alternative means would not suffice to adequately manage any concerns about prejudicial pretrial publicity. Indeed, in light of the lack of prejudicial statements by either defendant or his counsel, as detailed above, the parties should *at least* engage in "searching" *voir dire* before determining whether that procedure, along with other possibilities such as jury sequestration, would be inadequate to address concerns about prejudicial publicity. In the absence of any showing that the less restrictive means would not be adequate to address such concerns, the Court should decline to issue a gag order.

**4.   In the Alternative, If The Court Issues a Gag Order, It Must Ensure That The Gag Order Is Narrowly Tailored**

As explained herein, defendant believes that a gag order is unwarranted because there is no substantial, or even reasonable, likelihood of prejudice to a fair trial based on statements made by defendant or his counsel since May 1, 2013.

If the court concludes despite defendant's arguments that a gag order is warranted, such a gag order must be "narrowly tailored." *Brown*, 218 F.3d at 428. A narrowly tailored gag order would only restrict First Amendment protected speech and expression by the defendant and his counsel to the extent necessary. Texas Disciplinary Rule of Professional Conduct 3.07, entitled

"Trial Publicity," already imposes on lawyers certain ethical obligations relating to the types of statements that may and may not be made in all trials, including criminal trials.[4] Rule 3.07, is explicitly formulated in order to preserve the litigants' constitutional rights to a fair trial while balancing that need with free speech rights. *See* Rule 3.07, Comments 1, 2.  In addition to containing a general prohibition against prejudicial statements, the Rule also forbids five types of statements, and clarifies what types of extrajudicial statements are allowed:

> (b) A lawyer ordinarily will violate paragraph (a), and the likelihood of a violation increases if the adjudication is ongoing or imminent, by making an extrajudicial statement of the type referred to in that paragraph when the statement refers to:

> > (1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness; or the expected testimony of a party or witness;

> > (2) in a criminal case or proceeding that could result in incarceration, the possibility of a plea of guilty to the offense; the existence or contents of any confession, admission, or statement given by a defendant or suspect; or that person's refusal or failure to make a statement;

> > (3) the performance, refusal to perform, or results of any examination or test; the refusal or failure of a person to allow or submit to an examination or test; or the identity or nature of physical evidence expected to be presented;

> > (4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration; or

> > (5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial.

> (c) A lawyer ordinarily will not violate paragraph (a) by making an extrajudicial statement of thetype referred to in that paragraph when the lawyer merely states:

> > (1) the general nature of the claim or defense;

---

[4] The Texas Disciplinary Rules of Professional Conduct are available at http://webcache.googleusercontent.com/search?q=cache:6VtneCZVXzQJ:www.texasbar.com/AM/Template.cfm%3FSection%3DGrievance_Info_and_Ethics_Helpline%26Template%3D/CM/ContentDisplay.cfm%26ContentFileID%3D96+&cd=1&hl=en&ct=clnk&gl=us (last visited September 2, 2013).

(2) the information contained in a public record;

(3) that an investigation of the matter is in progress, including the general scope of theinvestigation, the offense, claim or defense involved;

(4) except when prohibited by law, the identity of the persons involved in the matter;

(5) the scheduling or result of any step in litigation

Rule 3.07(b–c).

To the extent that any gag order is necessary, it should be no broader than Rule 3.07 because this Rule properly balances the public's right to information on the trial, the litigants' rights to free speech, and the parties' right to a fair trial with a jury untainted by prejudicial publicity. If the court issues a gag order, it should match the wording of Rule 3.07.

## CONCLUSION

For the reasons set forth above, the Mr. Brown respectfully request that the Court deny the government's request for a gag order.

Respectfully submitted,

   -s- *Ahmed Ghappour*
AHMED GHAPPOUR
*Pro Hac Vice*
Civil Rights Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
415-598-8508
512-232-0900 (facsimile)
aghappour@law.utexas.edu

CHARLES SWIFT
*Pro Hac Vice*
Swift & McDonald, P.S.
1809 Seventh Avenue, Suite 1108
Seattle, WA 98101
206-441-3377
206-224-9908 (facsimile)

cswift@prolegaldefense.com

MARLO P. CADEDDU
TX State Bar No. 24028839
Law Office of Marlo P. Cadeddu, P.C.
3232 McKinney Ave., Suite 700
Dallas, TX 75204
214.744.3000
214.744.3015 (facsimile)
mc@marlocadeddu.com
*Attorneys for Barrett Lancaster Brown*

CERTIFICATE OF SERVICE

I certify that today, September 4, 2013, I filed the instant motion using the Northern District of Texas's electronic filing system (ECF) which will send a notice of filing to all counsel of record.

/s/ Ahmed Ghappour
AHMED GHAPPOUR
/s/ Charles Swift
CHARLES SWIFT
/s/ Marlo P. Cadeddu
MARLO P. CADEDDU
*Attorneys for Barrett Lancaster Brown*