IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION
_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No.   3:12-CR-317-L |
| v. | § | |
| | § | |
| BARRETT LANCASTER BROWN | § | |

GOVERNMENT'S OPPOSITION TO
BROWN'S MOTION TO DISMISS THE INDICTMENT,
HIS REQUEST TO STRIKE SURPLUSAGE,
AND FOR A BILL OF PARTICULARS

1.     The United States Attorney for the Northern District of Texas, by and through the

undersigned Assistant United States Attorney, files this opposition to Brown's Motion to

Dismiss the Indictment.

BROWN'S CLAIMS SUMMARIZED

2.     Brown sets out two points in support of his motion to dismiss.   First he claims that

Counts One and Three fail to state an offense regarding a "true threat."   Second he claims

that Count Two fails to allege the essential elements of the crime charged, specifically an

unlawful agreement and an overt act.

3.     Third, as an alternative to his first two points, Brown requests that the court strike

surplusage or order the government to file a Bill of Particulars.

**Government's Opposition to Motion to Dismiss - Page 1**

## THE GOVERNMENT'S OPPOSITION SUMMARIZED

4.      Regarding Brown's first point, Counts One and Three adequately state an offense. Brown's statements are "not entitled to First Amendment protection under the true threat doctrine because his [statements] would have reasonably been considered a threat" to Federal Bureau of Investigation (FBI), Special Agent (SA) [RS].   P*orter ex re. LeBlanc v. Ascension Parish School Bd*., 301 F.Supp.2d 576, 585 (M.D.La. January 21, 2004).   The question of whether Brown's statements constituted a "true threat" is an issue of fact for the jury.

5.      Regarding Brown's second point, Count Two adequately states an offense.

6.      Regarding Brown's request to strike surplus, the challenged language is relevant and inextricably intertwined with the charged conduct.   Brown fails in his burden to show that the requested language is *not* relevant to the government's case *and* is prejudicial *and* inflammatory.

## PROCEDURAL BACKGROUND

7.      In or about September 2012, the United States Magistrate Judge Paul D. Stickney issued a Criminal Complaint for the arrest of Barrett Brown.   On the same evening, the Federal Bureau of Investigation arrested Brown pursuant to an arrest warrant issued for the complaint.   On October 3, 2012, a federal Grand Jury returned a true bill of Indictment charging Brown with three separate violations of federal law.

8.      Count One charged Brown with violations of 18 U.S.C. § 875(c), that being transmitting threats via the Internet to injure another person.

**Government's Opposition to Motion to Dismiss - Page 2**

From on or after March 6, 2012, through and including on or about September 12, 2012, in the Dallas Division of the Northern District of Texas, the defendant Barrett Lancaster Brown, knowingly and willfully did transmit in interstate and foreign commerce communications containing threats to injure the person of another, that being, Barrett Lancaster Brown transmitted messages through the Internet on his Twitter.com account and his YouTube.com account, threatening to shoot and injure agents of the Federal Bureau of Investigation, and specifically focusing on Federal Bureau of Investigation Special Agent [RS].

9.      Count Two charged Brown with conspiring with another to make restricted personal information about a specific FBI agent and his family publicly available (18 U.S.C. §§ 371 and 119).

Between on or about March 5, 2012 through on or about September 12, 2012, in the Dallas Division of the Northern District of Texas, the defendant Barrett Lancaster Brown, knowingly and willfully did combine, conspire, confederate, and agree with other persons known and unknown to the grand jury, to commit an offense against the United States, to wit: to make restricted personal information about Federal Bureau of Investigation Special Agent [RS] and his immediate family publicly available with the intent to threaten and intimidate the Special Agent and to incite the commission of a crime of violence against the Special Agent in violation of 18 U.S.C. § 119, in that in September 2012 in the Northern District of Texas, Barrett Lancaster Brown requested another person known to the grand jury to assist him find on the Internet restricted information about Federal Bureau of Investigation Special Agent [RS] and [RS]'s family, and that other person agreed to do so, and furthermore, the other person did conduct a search on the Internet for the restricted information.

10.     Finally, Count Three charged Brown with retaliation against a law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B) and (b)(4).

Between on or about March 5, 2012 through on or about September 12, 2012, in the Dallas Division of the Northern District of Texas, the defendant Barrett Lancaster Brown, did knowingly and willfully threaten to assault a Federal Law enforcement officer, with the intent to impede, intimidate, and interfere with such Federal Law enforcement officer while engaged in the

performance of official duties, and with the intent to retaliate against such Federal Law enforcement officer on account of the performance of official duties.

<u>RESPONSE TO BROWN'S FIRST POINT:</u>
<u>COUNTS ONE AND THREE ADEQUATELY STATE AN OFFENSE</u>

11.    Count One (18 U.S.C. § 875(c)) requires the government to prove that (1) Brown knowingly transmitted a communication in interstate commerce, and (2) the communication contained a threat to injure the person of another.    Count Three (18 U.S.C. § 115(a)(1)(B) and (b)(4)) requires the government to prove that (1) Brown knowingly threatened to assault a federal law enforcement officer, (2) at the time of the threat, the individual threatened was a federal law enforcement officer, and (3) Brown acted with the intent to impede, intimidate, or interfere with a federal law enforcement officer while engaged in the performance of his official duties or Brown acted with the intent to retaliate against that official on account of the performance of his official duties. The only aspect of the essential elements complained about by Brown is whether the threat was a "true threat."    Brown statements constituted "true threats," especially when viewed in light of the surrounding circumstances.   The determination of whether this is a "true threat" is an evidentiary issue, and the task of interpretation is for the jury.   "'If a reasonable recipient, familiar with the contents of the communication, would interpret it as a threat, the issue should go to a jury.'" *United States v. Raymer,* 876 F.2d 383, 391 (5th Cir. 1989), quoting *Martin v. United States,* 691 F.2d 1235, 1240 (8th Cir.1982).

**Government's Opposition to Motion to Dismiss - Page 4**

<u>Brown's Conduct as Set Out in the Introduction to the Indictment is Intrinsic to Brown's</u>
<u>Indicted Conduct</u>

12.     Viewing Brown's comments and conduct as a whole, there is no doubt the

statements by Brown set out in the Introduction to the Indictment constituted a "true

threat," reasonably causing his target, FBI SA [RS] to be apprehensive and to have concern

for his own personal safety and the safety of his family.   Brown's past involvement with

Anonymous is crucial to understanding the significance of his threatening comments and

conduct.   On many occasions, Brown bragged about his association with Anonymous and

claimed that he created ProjectPM to further those actions of Anonymous that he

supported.   Brown recruited personnel to work for him by culling from the participants in

Anonymous.   Brown communicated with his associates through the Internet via e-mail,

Twitter.com, Youtube.com, Tinychat.com, IRC channels related to Anonymous and

ProjectPM, and through interviews he gave to media outlets.   Furthermore, Brown has

privately stated that he intended ProjectPM to be a "front" organization for Anonymous

which secretly plotted the overthrow of the government.   Brown used Anonymous and

ProjectPM to target government employees on multiple occasions, particularly

government employees in or associated with the United States justice system.

13.     Brown assisted Anonymous members by identifying targets; providing advice to the

Anonymous hackers on what data to steal; and using the stolen data for further targeting, as

well as to harass and occasionally to threaten those targets.   In some cases, Brown offered

monetary bounties for producing personal identifying information on law enforcement officers whom he had targeted.

14.     More specific to the indicted threats, Brown targeted FBI SA [RS] for (1) seizing Brown's computers and property during the legal execution of a search warrant, and (2) Brown's fabricated contention that [RS] harassed and threatened Brown's mother. Brown publically vented his anger at the government, at the FBI, and specifically at FBI SA [RS].   Brown sought the assistance of Anonymous members and followers to provide information to identify and locate FBI SA [RS] and his children.   Brown encouraged his associates to "retaliate," revolt, take to the "streets," act, and "kill every government." [sic] Brown personally threatened to shoot any law enforcement officer that appeared at his door, and announced publically that he "was armed," came "from a military family," and knew how to shoot.   As evidence of his abilities, he posted a video of himself shooting a long gun.   Brown tweeted, the "[t]hreat to put my mom in prison last mistake #Agent[RS] will ever fucking make" and posted links to three fifteen minute home-made videos in which he ranted and raged and threatened physical harm to FBI SA [RS].   On the videos, Brown stating that he was "fucking angry" at FBI SA [RS], that "[RS]'s life [was] over" and that he was "going to ruin [[RS]'s] life and look into his fucking kids."   Brown specifically said he would "shoot all of them and kill them" if they came to his door, referring to law enforcement in general and specifically to the FBI.   Brown's concluding remarks in the third video predicted a standoff, resulting in Brown's death and the death of at least two FBI agents.   Brown stated, "[a]nd frankly, you know, it was pretty obvious I

was going to be dead before I was forty or so, so, I wouldn't mind going out with two FBI

side arms like a fucking Egyptian Pharaoh.   Adios."

"True Threat"

15.    Crimes that contain a "threat" element such as a violation of 18 U.S.C. §875(c)

should be interpreted "with the commands of the First Amendment clearly in mind." *Watts*

*v. United States*, 394 U.S. 705, 707 (1969).   "True threats" are a historic and traditional

exception to the bar against content-based restrictions on speech. See U*nited States v.*

*Alvarez,* 132 S.Ct. 2537, 2544 (2012).   They are "statements where the speaker means to

communicate a serious expression *of an intent* to commit an act of unlawful violence to a

particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003)

(Emphasis added).   Per the Fifth Circuit Pattern Jury Instructions 2012 Edition, "[a]

"threat" is a serious statement expressing an intention to injure [kidnap] any person, which

under the circumstances would cause apprehension in a reasonable person, as distinguished

from mere idle or careless talk, exaggeration, or something said in a joking manner."   See

*United States v. Daughenbaugh*, 49 F.3d 171, 173 n.2 (5th Cir. 1995) (approving this

instruction on the definition of threat with respect to 18 U.S.C. § 876); *United States v.*

*Turner*, 960 F.2d 461, 464 & n.3 (5th Cir. 1992).

16.    It is not necessary to prove that the defendant actually intended to carry out the

threat made.   *United States v. Morales,* 272 F.3d 284, 288-289 (5th Cir. 2001).   It is not

necessary to prove that the defendant actually wrote or created the communication.

*United States v. Turner,* 960 F.2D 461, 463-464 (5th Cir. 1992).   It is not necessary to

prove that the defendant communicated the threat directly to the victim.   *Morales,* 272

F.3d at 288.   It is not necessary to prove that the defendant was even capable of carrying

out the threat.   *United States v. Guevara*, 408 F.3d 252, 258 (5th Cir. 2005) (dealing with a

violation of 18 U.S.C. §2332a).   What the government must prove beyond a reasonable

doubt is that the defendant transmitted or sent the communication containing a "threat" in

interstate commerce, and the threat was such to cause a reasonable person to be

apprehensive, i.e. anxious or uneasy.

17.     Fed. R. Crim. P. 7(c)(1) provides that an indictment "must be a plain, concise, and

definite written statement of the essential facts constituting the offense charged."    Rule

7(c)(1) "is designed to simplify indictments by eliminating unnecessary phraseology which

needlessly burdened many indictments under the former practice."   *United States v.*

*Debrow*, 203 F.2d 688, 701-02 (5th Cir. 1953).   Counts One and Three track the language

in the applicable statutes, thereby providing the defendant notice of the charges against

him.

<u>Case Law Examples of "True Threats"</u>

18.     Most courts view the intent element in a threat crime as objective. "A § 875(c)

prosecution, then, generally requires the government to establish [a threat that] a

reasonable observer would construe as a true threat to another.   Once the government

makes this showing . . . it matters not what the defendant meant by the communication, as

opposed to how a reasonable observer would construe it." *United States v. Jeffries*, 692

F.3d 473 (6th Cir. 2012). *See also United States v. Martinez*, 2013 WL 6182973 (11th Cir.

Nov. 27, 2013); *United States v. Elonis,* 2013 WL 5273118 (3d Cir. Sept. 19, 2013); *United States v. White*, 670 F.3d 498, 506-12 (4th Cir. 2012).

19.     In *Virginia v. Black*, 538 U.S. 343 (2003)*,* one defendant burned a cross at a Ku Klux Klan rally that could be seen by the public; the other two defendants burned a cross on the lawn of their African-American neighbor's home.   Defendants appealed, arguing that the cross-burning statute violated the First Amendment. In *Virginia v. Black*, the Supreme Court noted that "'[t]rue threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."   However, the Supreme Court stressed that "the speaker need not actually intend to carry out the threat.   Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur."   (internal citations and quotations omitted).

20.     In *United States v. Stefanik*, 674 F.3d 71 (1st Cir. 2012), the defendant was upset because a notice of default had issued in a civil case.   During a telephone call to a clerk's office employee, he said:

> "What kind of douche bags do you hire? I'll come down there with my shotgun and show you who means business."   A few minutes later the defendant added, "You're lucky I'm only talking on the phone and not driving down there with my shotgun."

The First Circuit Court of Appeals found these statement to constitute a true threat, and affirmed the district court's use of a pattern jury instruction (Sand and Seifert) defining the

term "intimidate" to mean "make timid or fearful, to inspire or affect with fear, to frighten, deter, or overawe."

21.     In *United States v. Stinnett,* 313 F. App'x 711 (5th Cir. 2009), a defendant sent letters to an Immigration and Customs Enforcement agent threatening to shoot him in the head with a gun or plant bombs in the ICE office.   The government offered evidence to show that the agent was concerned for his safety and his family's safety.   The Fifth Circuit opined that "[a] communication is a true threat if in its context it would have a reasonable tendency to create apprehension that its originator will act according to its tenor."

22.     In *United States v. Guevara*, 403 F.3d 252 (5th Cir. 2005), a defendant sent a letter to a District Judge, stating "I am sick and tired of your games[.] All [A]mericans will die as well as you.   You have been now [sic] exposure [sic] to anthrax.   Mohammed Abdullah." The substance turned out to be hair gel and powdered cleanser.   Following the rationale in *United States v. Reynolds*, 381 F.3d 404, 406 (5th Cir.2004) (see below), the Fifth Circuit Court of Appeals opined that there was no requirement of a reference to a future act.   The court also reiterated that the government need not prove that the defendant intended, or was able, to carry out the threat and further held that it was not error for the jury to be so instructed.

23.     In *United States v. Reynolds*, 381 F.3d 404 (5th Cir. 2004), during a dispute with his mortgage company, a defendant told the customer service agent over the telephone that he "just dumped anthrax in [their] air conditioner."   The Fifth Circuit Court of Appeals adopted the definition of "threaten" in § 2332a as articulated in *United States v. Myers*, 104

F.3d 76, 79 (5th Cir. 1997), that being a communication that has a reasonable tendency to create apprehension that the originator of the communication will act as represented.

24.    In *United States v. Morales,* a defendant had the following conversation another person in a chat room:

> Morales: I will kill
> Lees: huh?– me You will kill what–me
> Morales: TEACHERS AND STUDENTS AT MILBY (Defendant's high school)
> Lees: Why do you want to do that Where is Milby?
> Morales: CAUSE AM TIRED...HOUSTON
> Lees: are you really going to go and kill people Who has made you mad r u ok do
> you want to talk to me
> Morales: YES F NE ONE STANDS N MY WAY WILL SHOT
> Lees: r u ok
> Morales: I HATE LIVE
> Lees: I am here
> Morales: YES MY NAME S ED HARRIS SEE U N A COUPLE OF MONTHS

The other person alerted the Milby High School, and extra security measures were taken. The Fifth Circuit Court of Appeals held that defendant's statements constituted "true threats," stating that the statute did not require that the threats be made directly to the intended target.   The court iterated its prior standard: "the communication 'in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor.'"   *United States v. Morales,* 272 F.3d at 288, citing *United States v. Myers*, 104 F.3d 76, 78 (5th Cir. 1997), quoting U*nited States v. Bozeman*, 495 F.2d 508, 510 (5th Cir. 1974).

25.     In *United States v. Myers*, 104 F.3d 76 (5th Cir. 1997), a defendant who was disgruntled with the VA, told a congressional staff member on the telephone that he "would take matters into his own hands" and that they "should be sure to have plenty of body bags around."   When questioned about his intention during a follow up telephone call, the defendant stated that he was "still talking about body bags." He then said he was "going to get retribution for my and my family's suffering.   You can take that to the bank." When asked what that meant, the defendant said it meant he would "do what, ah, like we said in Nam, whatever it takes."   Later in the conversation, the defendant said that he had a friend in Seattle who had TOW missiles, and spoke of "coming up there to die."   A few weeks later, the defendant called the office of the Paralyzed Veterans of America.   In that conversation, the defendant threatened the "VA and Congress with damage severe enough to make the explosion in the World Trade Center look like a picnic."   He stated that he was "head of the militia in this area" and made reference to AK-47 rifles being shoved into the faces of congressmen.

26.     The Fifth Circuit held in *Meyers* that "whether a statement amount[ed] to a threat under § 875(c) depend[ed] on its context.   In order to convict, a fact finder must determine that the recipient of the in-context threat reasonably feared it would be carried out.   It was entirely appropriate, then, for the jury to consider the context . . . for the context was directly relevant to how [the victim] perceived the threat.   Indeed, it probably would have been inappropriate for the jury not to consider these statements."   The Fifth Circuit also

opined that § 875(c) was a general intent, not a specific intent, crime, thus the government need not prove that the defendant intended his statements be threats.

27.     In *Shackelford v. Shirley,* 948 F.2d 935 (5th Cir. 1991), a defendant told his former supervisor on the telephone that the next time the supervisor appeared at the defendant's place of business, he would be "toting an ass whipping."   The Fifth Circuit Court of Appeals held that, "as expansive as the First Amendment's conception of social and political discourse may be, threats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving of no First Amendment protection."

28.     In his motion to dismiss, Brown erroneously represented that the unpublished Fifth Circuit opinion in *United States v. O'Dwyer*, 443 Fed.Appx 18, 2011 WL 4448739 (C.A.5 (La)) set out a Fifth Circuit standard for a statement to qualify as a "true threat."   In reality, the Court in *O'Dwyer* only dealt with the specific facts in that case, finding that the threat in that case did not qualify as a "true threat."

29.     The actual factors considered by the Circuits to determine a "true threat" include (1) the recipient's reaction,[1] (2) whether the threat was conditional, (3) to whom the threat was communicated,[2] (4) the history of the relationship between the defendant and the victim, and (5) the context in which the threat was made.   Brown seeks to have this Honorable Court invade the province of the jury by opining on the existence of a "true

---

1 *United States v. Morales*, 272 F.3d 284, 287-8 (5th Cir. 2001) (explaining that statement is a true threat if recipient placed in fear of bodily harm and holding that the fact that recipient felt apprehension was factor in true threat analysis.)

2 *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001) (finding that statements made to a third party in an internet chat room were true threats under 18 U.S.C. § 875(c).)

threat."   The question of whether Brown's statements constituted a "true threat" is an issue of fact for the jury.

RESPONSE TO BROWN'S SECOND POINT:
COUNT TWO ADEQUATELY STATES AN OFFENSE

Conspiracy (18 U.S.C. § 371) to Make Restricted Personal Information of a Government Employee Publically Available (18 U.S.C. § 119)

30.   Brown claims that Count Two failed to allege the elements of the 18 U.S.C. § 371 conspiracy, specifically an agreement and an overt act.   The government contends that the Indictment more than adequately sets out the essential elements of the offense, gives the defendant sufficient notice of the charges against him, and absolutely protects the defendant's rights against double jeopardy.

31.   Count Two adopts the allegations in the Introduction of the Indictment and reads as follows:

> Between on or about March 5, 2012 through on or about September 12, 2012, in the Dallas Division of the Northern District of Texas, the defendant Barrett Lancaster Brown, knowingly and willfully did combine, conspire, confederate, and agree with other persons known and unknown to the grand jury, to commit an offense against the United States, to wit: to make restricted personal information about Federal Bureau of Investigation Special Agent [RS] and his immediate family publically available with the intent to threaten and intimidate the Special Agent and to incite the commission of a crime of violence against the Special Agent in violation of 18 U.S.C. § 119, in that in September 2012 in the Northern District of Texas, Barrett Lancaster Brown requested another person known to the grand jury to assist him find on the Internet restricted information about Federal Bureau of Investigation Special Agent [RS] and [RS]'s family, and that other person agreed to do so, and furthermore, the other person did conduct a search on the Internet for the restricted information.

32.     An Indictment adequately charges an offense if it "'(1) enumerates each prima facie element of the charged offense, (2) notifies the defendant of the charges filed against him, and (3) provides the defendant with a double jeopardy defense against future prosecutions.'" *United States v. McBirney*, 2006 WL 2432675, at 8 (N.E. Tex. Aug. 21, 2006) (Fitzwater, J.).   "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards."   *United States v. Gordon* 780 F.2d 1165, 1169 (5th Cir. 1986).

33.     To establish a violation of 18 U.S.C. § 371 in the Fifth Circuit, the government must prove that (1) Brown and at least one other person made an agreement to commit a violation of 18 U.S.C. § 119[3] as described in the Indictment; (2) Brown knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and (3) one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Indictment, in order to accomplish some object or purpose of the conspiracy.

34.     Count Two "enumerates" the prima facie elements of a violation of 18 U.S.C. § 371. Count Two stated that Brown "knowingly and willfully did combine, conspire, confederate, and agree with other persons," satisfying element number one (see preceding paragraph for the "elements").   Count Two stated that Brown and the other(s) conspired "to commit an offense against the United States, to wit: to make restricted personal

---

3     The essential elements of a violation of 18 U.S.C. § 119 are that (1) the defendant knowingly made restricted personal information about a covered person, or a member of the covered person's immediate family, publicly available; (2) the defendant did so with the intent to threaten, intimidate, and incite the commission of a crime of violence against that covered person; (3) FBI SA Robert Smith was a covered person; and (4) the information made public was restricted personal information.

**Government's Opposition to Motion to Dismiss - Page 15**

information about Federal Bureau of Investigation Special Agent [RS] and his immediate family publically available with the intent to threaten and intimidate the Special Agent and to incite the commission of a crime of violence against the Special Agent in violation of 18 U.S.C. § 119," satisfying element number two.   Lastly, Count Two stated that "Brown requested another person . . . to assist him find on the Internet restricted information about Federal Bureau of Investigation Special Agent [RS] and [RS]'s family, and that other person agreed to do so, and furthermore, the other person did conduct a search on the Internet for the restricted information," satisfying element number three and further satisfying element number one.

35.    The Introduction to the Indictment clearly outlined Brown's rage and anger with FBI Special Agent [RS] and Brown's unwavering obsession with hunting down and hurting FBI Special Agent [RS] and his children.   Brown encouraged the doxing[4] of law enforcement[5] while he railed against law enforcement and Special Agent [RS] specifically.   Brown claimed "*we* are investigating [RS] now"[6] (emphasis added) and asked others to "[s]end all info on Agent [RS] to [Brown's email address] so FBI can watch [Brown] look up his kids."[7]

---

[4]    To "dox" meant to acquire personal information about an individual, without that individual's knowledge or permission.   The information acquired could include names and aliases, physical addresses, email addresses, phone numbers, social security numbers, financial information (bank, credit card), employment information, identifiers of the individual's family members, etc.

[5]    Introduction to the Indictment 3:12-CR-317-L, paragraph 2.b.

[6]    Introduction to the Indictment 3:12-CR-317-L, paragraph 12.a.

[7]    Introduction to the Indictment 3:12-CR-317-L, paragraph 13.

**Government's Opposition to Motion to Dismiss - Page 16**

36.    In his motion, Brown complains that "search on the Internet cannot be in furtherance of making restricting [sic] information public."   As Brown well knows, restricted information is defined at 18 U.S.C. § 119, as information to include "the Social Security number, the home address, home phone number, mobile phone number, personal email, or home fax number of" the covered person.[8]   A search on the Internet absolutely can result in the acquisition of restricted information.[9]   Plus, Brown's previous acquisition of restricted information from known hackers, and his continued association with these known hackers leaves no doubt that Brown was more than capable of obtaining whatever information he sought.

## THERE IS NO SURPLUSAGE

37.    Brown asks for following items to be struck from the Indictment: Paragraphs 2-4, 7(a-e),8(a, c, e-f).   In the same surplusage argument, Brown requests that the time frame of the criminal conduct as alleged in the indictment be limited to only acts occurring after September 2012.

38.    The paragraphs identified as surplusage by Brown are part of the introduction to the Indictment and are relevant to the offenses charged.   Brown fails to prove that the language is not relevant, much less not relevant and prejudicial and inflammatory.

39.    Brown mistakenly identifies paragraph 7 as a paragraph with subparts.   Paragraph 7 is a stand-alone paragraph.   The challenged language sought to be stricken as surplusage

---

8       18 U.S.C. § 2725(4) provides that "highly restricted person information" means an individual's photograph or image, social security number, medical or disability information."
9       Johnson v. West Pub. Corp., 504 Fed.Appx. 531, **1, (C.A.8 (Mo.) April 9, 2013).

**Government's Opposition to Motion to Dismiss - Page 17**

is relevant and material to the charges alleged in the Indictment.   Because the contested language is relevant to proving the crimes charged, it cannot and should not be stricken as surplusage.   Also, although an indictment need not set forth the evidentiary details of the offenses charged, *see, e.g., United States v. Moody*, 923 F.2d 341, 351 (5th Cir. 1991); *see also United States v. Williams*, 679 F.2d 504, 508 (5th Cir. 1982) (noting that Rule 7(c) "does not mean that the indictment must set forth facts and evidentiary details necessary to establish each of the elements of the charged offense."), there is no prohibition against pleading "evidentiary allegations," and Brown has cited none.   As Brown well knows, the Indictment is not evidence and the parties must establish the admissibility of evidence at trial, despite the Indictment's allegations.

40.     Fed. R. Crim. P. 7(d) provides that "[t]he court on motion of the defendant may strike surplusage from the indictment."   Fed. R. Crim. P. (7)(d). "It is well settled that a motion to strike surplusage from an indictment may be granted only if the challenged allegations *are not relevant to the charges and are inflammatory*." *United States v. Eisenberg*, 773 F. Supp. 662, 700 (D. N.J. 1991) (emphasis added) citations omitted except for *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir.1971). A defendant must establish that the challenged language is *"irrelevant, inflammatory, and prejudicial"* to successfully move to strike. *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir.1993); (cited in *United States v. Solomon*, No. 00-11210, 273 F.3d 1108, at * 1 (5th Cir. Sept. 21, 2001).   If "the charge is not materially broadened and the accused is not misled," then the surplusage should remain in the indictment. *United States v. Quintero*, 872 F.2d

107, 111 (5th Cir.1989); *United States v. Trice*, 823 F.2d 80, 89 n. 8 (5th Cir.1987).

Accordingly, if the challenged language is relevant *and* prejudicial, it should not be

stricken as surplusage. *United States v. Climatemp*, 482 F. Supp. 376, 391 (N.D. Ill.

1979) ("[I]f the language in the indictment is information which the government hopes to

properly prove at trial, it cannot be considered surplusage no matter how prejudicial it

may be (provided, of course, it is legally relevant).").    The decision to grant or deny a

motion to strike portions of an indictment is left to the sound discretion of the district

court. *Graves*, 5 F.3d at 1550.    The standard for striking surplusage is an "exacting [one]

which is met only in rare cases." *Eisenberg*, 773 F. Supp. at 700; *Solomon*, 273 F.3d

1108, at *1 (citing *Bullock*, 451 F.2d at 888).

41.    In effect, the defense has a two-pronged burden. To prevail, the defense must first

show that the challenged language is not relevant to the charges.    If the Court

determines that the challenged language is irrelevant, it must then determine whether the

language is inflammatory and sufficiently prejudicial to be stricken.    Only if the

language is so inflammatory and prejudicial that it cannot be cured with a jury instruction

is it appropriate to strike the language. See *United States v. Daniels*, 159 F. Supp. 2d

1285, 1300 (D.Kan July 13, 2001) ("a proper instruction to the jury ordinarily can

alleviate the potential prejudicial effect of contested allegations in the indictment.");

*Lowther v. United States*, 455 F.2d 657, 666 (10th Cir. 1972) (language not prejudicial

because of Court's curative instructions); *United States v. Figueroa*, 900 F.2d 1211, 1218

(8th Cir. 1990) (denial of motion to strike surplusage proper where court repeatedly

instructed jury that the indictment was not evidence of any kind); *United States v. Ramirez*, 710 F.2d 535, 544-45 (9th Cir.1983) ("court properly instructed the jury both at the outset and at the completion of the trial that the indictment is not evidence against the accused and affords no inference of guilt or innocence").

42.     Brown has failed to prove that the challenged language is *not* relevant *and* is inflammatory *and* prejudicial, and further that the challenged language, if relevant, is so inflammatory and sufficiently prejudicial that a curative jury instruction could not be used.

43.     During the Introduction to the Indictment, Brown was quoted as posting references to #[10]Anonymous, #ProjectPM, Echelon2.org, and blackbloc.   These references are essential to the government's case, to show the context in which Brown made the threatening statements.

44.     Paragraph 2a-e of the Introduction of the Indictment sets out postings by Brown on his Twitter.com account on or about September 4, 2012.   Although not all inclusive, the below sets out at least one reason why each of the below items are relevant.

| Indictment | Relevance |
|---|---|
| a.     "Don't be a pussy. Call up every facist and tell them you're watching. http://www.youtube.com/watch?v=4gcptY8ne14 ... #ProjectPM." | In this posting, Brown encouraged his associates to harass government-related authority figures. The attached link contained a recording of Brown calling and harassing such a person using personal identifying information exfiltrated during the breach of H.B.Gary. |

---

[10]     The hash-tag (#) allows Twitter.com users to organize and categorize postings, which makes the topics easy to search and reference.

**Government's Opposition to Motion to Dismiss - Page 20**

| | |
|---|---|
| b.      "Have you doxed a pig today? Be ready for the #revolution - have a list informationliberation.com/?id=40815 #Anonymous." | In this posting, Brown encouraged his followers to dox law enforcement.   The attached link related to a law enforcement officer that was indicted in a shooting. |
| c.      "Don't know how to shoot? You've got five years to learn.   Maybe less.http://www.youtube.com/watch?v= wkqSIZaBhUY&list=UUv1FlZ4TdveCy va7okPRmSA&index=1&feature=plcp ... #Anonymous #ProjectPM   #blackbloc." | The attached link accessed a video of Brown possessing, shooting, and reloading a long gun.   The video was entitled "If only all of Rome had just one neck."   Blackbloc referred to a manner of demonstrating or protesting that included acts of violence. |
| d.      "#DHS stocking up on ammo. Are you? http://www.youtube.com/watch?v=wkqS IZaBhUY&list=UUv1FlZ4TdveCyva7o kPRmSA&index=1&feature=plcp ... Don't wait. Retaliate." | In this posting, Brown encouraged his associates to stock up on ammo and to retaliate. The attached link accessed a video of Brown possessing, shooting, and reloading a long gun.   The video was entitled "If only all of Rome had just one neck." |
| e.      "Have a plan to kill every government you meet. #ProjectPM tinychat.com/BarrettBrown #Anonymous Echelon2.org." | In this posting, Brown encouraged his associates to have a plan to kill governments. On occasion, Brown used an online chat website called Tinychat.com to communicate and coordinate with regarding operations against certain targets of his group. |

45.     Paragraph 3a-c of the Introduction of the Indictment sets out postings by Brown on his Twitter.com account on or about September 7, 2012.   Although not all inclusive, the below sets out at least one reason why each of the below items are relevant.

| Indictment | Relevance |
|---|---|
| a.      "Kids! Overthrow the US government lol https://www.youtube.com/watch?v=pHC dS7O248g Y" | In this posting, Brown encouraged his associates to overthrow the US government. |
| b.      "@Badger32d I've experienced other end of the gun, watching mom detained by U.S. armed thugs. See you on the streets!" | In this posting, Brown gave an explanation as to why he was angry at the FBI and wanted to retaliate. |

| | |
|---|---|
| c.      "#ProjectPM - Everyone in #Anonymous with balls is either with us or awaiting trial.   Don't wait. Retaliate." | In this posting, Brown referenced his connection to Anonymous and encourages his associates to retaliate. |

46.     Paragraph 4 of the Introduction of the Indictment sets out a posting by Brown on his Twitter.com account on September 7, 2012.   Although not all inclusive, the below sets out at least one reason why this posting is relevant.

| Indictment | Relevance |
|---|---|
| "Organize. Choose your pig. Make your move. Pastebin.com/HFxBIHv #ProjectPM #Anonymous #blackbloc #revolution." | In this posting, Brown encouraged his associates to target a law enforcement officer and act. |

47.     Paragraph 7 of the Introduction of the Indictment sets out a re-posting by Brown on his Twitter.com account on September 10, 2012. Although not all inclusive, the below sets out at least one reason why this posting is relevant.

| Indictment | Relevance |
|---|---|
| "A dead man can't leak stuff… Illegally shoot the son of a bitch." | In this posting, Brown promoted the idea of shooting a person because a dead person cannot talk. |

48.     Paragraph 8a, c, e-f of the Introduction of the Indictment sets out postings by Brown on his Twitter.com account on or about September 11, 2012.   Although not all inclusive, the below sets out at least one reason why each of the below items are relevant.

| Indictment | Relevance |
|---|---|
| a.       "0 uploading now, dropping in 30 minutes #Anonymous #Wikileaks #ProjectPM #PantherModerns #FBI #Agent[RS]." | In this posting, Brown referenced an ultimatum given to FBI SA [RS], and advised his associates and FBI SA [RS] that he was uploading the first Youtube.com threat video. |

| | |
|---|---|
| c.     "@AsheraResearch My mother is being threatened with charges by #FBI due in part to your lies. Mention her again and see what happens." | In this posting, Brown expressed his anger surrounding his incorrect perception that the FBI threatened his mother.   Brown threatened to retaliate if his mother was "mentioned" again. |
| e.     "#ProjectPM backs up its claims, threats. Don't wait. Retaliate. #OpClydeTolson #Anonymous #Wikileaks http://www.youtube.com/watch?v=klvP1Xx6OH4&feature=youtu.be . . ." | In this posting Brown encouraged his associates to retaliate, and assured his associates that his entity ProjectPM would back up its threats.   The attached link accessed the first of three videos wherein Brown threatened FBI SA [RS] and gave the Agent an ultimatum.   Brown sought to retaliate for the search of his and his mother's residences.   The video was entitled "Why FBI Agent [RS] Has Two Weeks To Send My Property Back, Part 1/3"   Brown provided the following information related to the posting of this video: "See Echelon2.org for why I'm being raided, harassed, threatened, put at risk by law enforcement officers and private contractors. Echelon2.org is listed on my FBI search warrant which may be seen at Buzzfeed." |
| f.     "As I'll explain further tomorrow, I will regard any further armed raids as potential #Zeta assassination attempts and respond accordingly." | In this posting, Brown contended that any armed person appearing at his door, including law enforcement, would be shot. |

## A BILL OF PARTICULARS IS NOT APPROPRIATE

49.    Brown is correct in that the government's response to his request for a Bill of Particulars is that the Indictment adequately presents the essential facts and apprises him of the charges against him.   Also, the discovery provided by the government provides additional information regarding the charged conduct.   In January 2014, Brown took advantage of the government's repeated suggestion to meet with the government to

obtain an overview of the government's evidence.   During this meeting the government provided Brown with additional overt acts attributed to Brown and the identity of the coconspirators and associates referenced in the Indictment.

50.      Under the Fourth Amendment to the United States Constitution a defendant in a criminal action is entitled "to be informed of the nature and cause of the accusation...." In order to assure that an accused is provided constitutionally adequate notice, under Fed. R. Crim. P. 7(f), the trial court "may direct the filing of a bill of particulars." However, as case law holds, the basis for ordering a bill of particulars is limited. "The function of a bill of particulars is to enable the defendant to prepare for trial and avoid prejudicial surprise as well as providing protection from a subsequent prosecution for the same offense." *United States v. Burgin* 621 F.2d 1352, 1358 (5th Cir. 1980); *Wong Tai v. United States,* 273 U.S. 77 (1927); *United States v. Gorel,* 622 F.2d 100, 104 (5th Cir. 1979), *United States v. Haas,* 583 F.2d 216 (5th Cir. 1978).

51.      Courts have uniformly held that a bill of particulars is "not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial," *Burgin*, 621 F.2d at 1358; *United States v. Sheriff*, 546 F.2d 604, 606 (5th Cir. 1977); *Overton v. United States*, 403 F.2d 444, 446 (5th Cir. 1968); *Downing v. United States*, 348 F.2d 594, 599 (5th Cir. 1965). A bill of particulars is not an investigative vehicle for the defense. "A defendant should not use the Bill of Particulars to obtain a detailed disclosure of the government's evidence prior to trial." *United States v. Kilrain,* 566 F.2d 979, 985 (5th Cir. 1978).

52.     Brown has failed to articulate a basis for the granting of a Bill of Particulars.

<u>CONCLUSION</u>

53.     The government respectfully requests that this Honorable Court deny Brown's

Motion.

Respectfully submitted,

SARAH R. SALDAÑA
UNITED STATES ATTORNEY

*S/ Candina S. Heath*
CANDINA S. HEATH
Assistant United States Attorney
State of Texas Bar No. 09347450
1100 Commerce Street, 3rd Floor
Dallas, Texas   75242
Tel: 214.659.8600   Fax: 214.767.2846
candina.heath@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 14, 2014, I electronically filed the foregoing document with the clerk for the U.S. District Court, Northern District of Texas, using the electronic case filing (ECF) system of the court.   The ECF system sent a "Notice of Electronic Filing" to Brown's attorneys of record Ahmed Ghappour, Charles Swift, and Marlo Cadeddu, who consented in writing to accept this Notice as service of this document by electronic means.

*S/ Candina S. Heath*
CANDINA S. HEATH
Assistant United States Attorney